<pre>
                                                            O
</pre>

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CURTIS HAMILTON, an individual, on behalf of himself and all others similarly situated,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>GENESIS LOGISTICS, INC., a Delaware corporation,<br><br>　　　　　　Defendant.<br>_____ | Case No. CV 13-01848 DDP (VBKx)<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>[Dkt. No. 32] |

Before the court is Plaintiff Curtis Hamilton's Motion for Class Certification. (Dkt. No. 32.) The motion is fully briefed. Having considered the parties' submissions and heard oral argument, the court adopts the following order denying the motion.

**I.   Background**

Plaintiff Curtis Hamilton ("Hamilton") is a former employee of Defendant Genesis Logistics, Inc. ("Genesis"), a logistics company that supplies and distributes food products, primarily serving 7-Eleven stores. During the putative class period, Genesis operated centers in San Diego, Fontana, Fullerton, and Union City,

California. Hamilton worked as a Transportation Supervisor at the Fullerton location from September 2010 until approximately March 2011. (First Amended Complaint ("FAC") ¶ 4 and Ex. A at 1.) He brings this putative class action on behalf of himself and other Transportation Supervisors employed or formerly employed by Genesis at each of its locations in California. (See FAC ¶ 21; Motion at 2, 27.)

Hamilton alleges that, although he and other members of the putative class were designated as Transportation Supervisors and paid a salary, they were not supervisors as a matter of law and were misclassified as "exempt" from California requirements regarding overtime pay and meal and rest breaks. (Id. ¶ 15.) Hamilton alleges that he and other putative class members had no authority to hire and fire other employees, nor exercise discretion or independent judgment as part of their jobs. (Id.) He alleges that they "oversaw the work of subordinate truck drivers, but such supervision was limited in scope and took up less than half of any shift." (Id.) He alleges further that he and other putative class members "were required to perform manual labor as part of the production of Defendants," including "moving inventory, loading trucks, cleaning, driving trucks, and filing forms related to delivery." (Id.) Hamilton alleges that Genesis intentionally misclassified him as an exempt employee in order to avoid paying him overtime. (Id. ¶¶ 59-60.)

Hamilton alleges that, as a result of their misclassification as "exempt," he and other putative class members were denied overtime compensation, in violation of California Labor Code §§ 510, 1194, 1198; meal periods, in violation of Labor Code §§ 226.7

2

and 512; rest periods, in violation of Labor Code § 226.7; and accurate wage statements, in violation of Labor Code §§ 226 and 226.3. (Id. ¶¶ 36-61.) Hamilton also asserts derivative claims for prompt payment of wages under Labor Code § 216, waiting time penalties under Labor Code §§ 201, 202, 203, a claim under California's Private Attorney General Act, Labor Code §§ 2699 and 2699.31, and a claim for unfair business practices under California Business & Professions Code §§ 17200 et seq. (Id. ¶¶ 57-82.)

Hamilton seeks certification of a class comprised of "anyone who Genesis currently or formerly employed in California as [] 'Transportation Supervisors' from February 13, 2009 to the present." (Mot. at 10.) The parties agree that the putative class includes approximately 30 members. (Motion at 2; Opposition at 17.)

**II.  Legal Standard for Certification of Class Actions**

The party seeking class certification bears the burden of showing that each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b) are met. See Hanon v. Dataprods. Corp., 976 F.2d 497, 508-09 (9th Cir. 1992). Rule 23(a) sets forth four prerequisites for class certification:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

3

Fed. R. Civ. P. 23(a); Hanon, 976 F.2d at 508. These four requirements are often referred to as numerosity, commonality, typicality, and adequacy. See Gen. Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 156 (1982).

Rule 23(b)(3), the provision of Rule 23(b) that is relevant in this action, provides that a plaintiff seeking to certify a class must show that questions of law or fact common to the members of the class "predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

"In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974) (internal quotation marks and citation omitted). This court, therefore, considers the merits of the underlying claim to the extent that the merits overlap with the Rule 23(a) requirements, but will not conduct a "mini-trial" or determine at this stage whether Plaintiffs could actually prevail. Ellis v. Costco Wholesale Corp., 657 F.3d 970, 981, 983 n.8 (9th Cir. 2011).

**III. Discussion**

**A.   Executive and Administrative Exemptions**

As discussed, Hamilton asserts that he and other class members were misclassified as exempt under California law. The relevant exemptions, set forth in California's Industrial Wage Commission

4

(IWC) Order No. 9-2001, which applies to persons employed in the transportation industry, are for employees who work in executive or administrative capacities. Genesis appears to rely on both exemptions, although the parties focus primarily on the executive exemption.

Under IWC Order No. 9, a person employed in an executive capacity is any employee:

> (1) Whose duties and responsibilities involve the management of the enterprise in which he/she is employed or of a customarily recognized department or subdivision thereof; and
>
> (b) Who customarily and regularly directs the work of two or more other employees therein; and
>
> (c) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring and firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and
>
> (d) Who customarily and regularly exercises discretion and independent judgment; and
>
> (e) Who is primarily engaged in duties which meet the test of the exemption....

8 C.C.R. § 11090(1)(A)(1).

A person employed in an administrative capacity is any employee:

> (a) Whose duties and responsibilities involve ...(i) The performance of office or non-manual work directly related to management policies or general business operations of his/her employer or his/her employer's customers; ... and
>
> (b) Who customarily and regularly exercises discretion and independent judgment; and
>
> (c) Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity ...; or
>
> (d) Who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge; or

5

```
        (e) Who executes under only general supervision special
            assignments and tasks; and

        (f) Who is primarily engaged in duties which meet the test of
            the exemption. ...

        (g) Such an employee must also earn a monthly salary
            equivalent to no less than two (2) times the state minimum
            wage for full time employment.
```

8 C.C.R. § 11090(1)(A)(2).

In determining whether an employee is properly classified as "exempt," courts must inquire "first and foremost how the employee actually spends his or her time." <u>Ramirez v. Yosemite Water Co.</u>, 20 Cal.4th 785, 802 (1999). A trial court also should consider "whether the employee's practice diverges from the employer's realistic expectations, whether there was any concrete expression of employer displeasure over an employee's substandard performance, and whether these expressions were themselves realistic given the actual overall requirements of the job." <u>Id.</u>

**B.   Burden of Proof in Class Actions Asserting Misclassification**

Under California law, the employer bears the burden of demonstrating that an employee is exempt from the Labor Code's overtime requirements. <u>Nordquist v. McGraw-Hill Broadcasting Co., Inc.</u>, 32 Cal.App.4th 555, 562 (1995). "However, in order to maintain a class action challenging the overtime exemption, a plaintiff must have common evidence to support a legal theory of misclassification, either 'that deliberate misclassification was defendant's policy or practice' or similarly, that 'classification based on job descriptions alone resulted in widespread de facto misclassification.' A class action is appropriate if 'plaintiffs are able to demonstrate pursuant to either scenario that misclassification was the rule rather than the exception...'" <u>Marlo</u>

6

v. United Parcel Serv., Inc., 251 F.R.D. 476, 481 (C.D. Cal. 2008) aff'd, 639 F.3d 942 (9th Cir. 2011) (quoting Sav-On Drug Stores, Inc. v. Superior Court, 34 Cal.4th 319, 329 (2004)). In other words, "a plaintiff must provide common evidence of misclassification to maintain class certification and proceed with a class action trial." Id. at 483.

**C.  Rule 23 Analysis**

Because it is dispositive of the present motion, the court focuses its analysis here on Rule 23(b)(3)'s requirement that (1) common questions of law or fact predominate over questions affecting only individual members and that (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy. In doing so, the court addresses the sufficiency of common proof of misclassification, which is the basis for each of Hamilton's wage-and-hour claims.

**1.  Predominance**

The predominance requirement demands a rigorous inquiry that "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Products, Inc. v. Windsor, 521 U.S. 591, 623-24 (1997). To satisfy this requirement, it is not enough simply that common questions of law or fact exist; predominance is a comparative concept that calls for measuring the relative balance of common issues to individual ones. See id. "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy." Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1189 (9th Cir. 2001) (citing Valentino v. Carter-Wallace Inc., 97 F.3d 1227, 1234 (9th Cir. 1996)).

In moving for class certification, Hamilton relies principally on his own deposition testimony describing his experiences and his observation, based on conversations with other Genesis employees, that the San Diego and Fontana facilities had policies and practices that were similar to the Fullerton facility where he was employed, (see, e.g., Deposition of Curtis Hamilton at 23-28, 69-72.), as well as brief declarations of two additional Genesis Transportation Supervisors at other Genesis facilities. (Declarations of Salvador Lopez (San Diego) ¶¶ 2-9 and Kirby Benin (Union City) ¶¶ 2-7.))

In opposing class certification, Genesis relies primarily on detailed declarations of seven Transportation Supervisors, all putative class members, who describe experiences that differ markedly from those described by Hamilton and his declarants. (See Declarations of Steve Lund (Fullerton), Maria Billy (Fullerton), Ray Para (Fullerton), John Guidry (Union City), Wayne Lehndorfer (Union City), David Spaziani (Union City), Isreal Del Rio (San Diego) in Support of Opposition.) Genesis also submitted detailed declarations from three Transportation Managers, who supervise the Transportation Supervisors. (See Declarations of Brett Campbell (Fullerton, San Diego, and Fontana), Don Pope (Union City), and Desi Martinez (San Diego) in Support of Opposition.)

The evidence submitted by the parties reflects highly divergent experiences among putative class members in a range of areas that are central to determining whether an employee has been misclassified. This variation precludes a finding that common issues predominate over individual issues.

     First, there is substantial divergence on the issue of whether Transportation Supervisors play a role in hiring or firing other employees. As cited above, a role in hiring or firing decisions is an element of Wage Order No. 9's executive exemption. 8 C.C.R. § 11090(1)(A)(1)(c). On the one hand, Hamilton and his two declarants assert that they had no authority to hire and fire other employees or had any role in the hiring process. (<u>See, e.g.</u>, Hamilton Dep. II at 286:8-287:11 (stating that Hamilton interviewed "zero" drivers, reviewed "zero" job applications," and had no involvement in screening applicants); Benin Decl. ¶ ("I had no authority to hire or fire other employees. I did not give suggestions or recommendations as to the hiring or firing or as to the advancement and promotion or any other change of status of other employees"); Lopez Decl. (stating that he had no authority to hire or fire other employees).

     On the other hand, the seven Transportation Supervisors who provided declarations for Genesis stated that they played a substantial role in hiring and firing other employees. (<u>See, e.g.</u> Parra Decl. ¶ 8 ("I personally interviewed and made hiring recommendations for at least 50-60 drivers in the last year alone, and my recommendations were followed on each occasion."; Guidry Decl. ¶ 5 ("I do a significant amount of the hiring at the Union City station"); Lehndorfer Decl. ¶ 20 ("Even when I don't administer the discipline myself, my recommendations for discipline, including suspension or terminations, are given consideration by my General Manager. For example, I recommended that Genesis terminate a driver, Floyd H. approximately two or three weeks ago, and he was terminated."); Lund Decl. ¶ 5 (stating

that his tasks include "participating in the hiring process, including reviewing applications, conducting interviews, and providing comments, feedback, and recommendations to drivers that should and should not be hired by Genesis"); Spaziani Decl. ¶ 5 (same).

Second, there is divergence with respect to the degree to which members of the putative class exercised discretion or independent judgment, an element of both the executive and the administrative exemptions. C.C.R. § 11090(1)(A)(1)(d) and § 11090(1)(A)(2)(b). Hamilton and the two Transportation Supervisors whose declarations he submitted contend that their work entailed very limited discretion or independent judgment. (See FAC ¶ 15 (alleging that neither he nor other class members "exercise[d] discretion or independent judgment as part of their jobs"); Benin Decl. ¶ 5("I very rarely, way less than 50% of the time, exercised any discretion or independent judgment, as part of my job with Genesis); Lopez Decl. ¶ 6 (same).

By contrast, each of the seven Transportation Supervisors whose declarations were submitted by Genesis describe regularly exercising substantial discretion and judgment in the course of their work. (See, e.g., Guidry Decl., ¶ 11 ("As a manager of my department and the supervisor of the drivers, local management provides me with the authority and flexibility to rely on my skill and experience and do what works best for me"); Lund Decl., ¶¶ 3-6, 9-10, 13-22 ("[Factors such as] call-offs, accidents, injuries, and other unforeseen issues require me to react in real time to evaluate possible courses of action and use my experience and judgment to determine the best resolution under the

10

circumstances... Because of the fast-paced nature of Genesis' business, I am constantly using my discretion and judgment to problem solve."); Parra Decl. ¶ 22 ("I have discretion to make almost every decision in how I supervise the drivers and manage the daily operations of my department, and I make decisions based on my skill, experience, and judgment, as well as daily business needs.") Spaziani Decl., ¶ 22 (same); Lehndorfer Decl., ¶ 25 (same); Del Rio Decl., ¶ 21 (same); Billy Decl., ¶ 24 (same).

Third, there is divergence regarding whether putative class members were required to perform manual labor, an element of the administrative exemption. See 8 C.C.R. § 11090(1)(A)(2)(a). Hamilton and his declarants assert that they were required to perform substantial manual labor. (See Hamilton Dep. I at 92:2-7 ("I was ... being told to load trucks, move trucks, do whatever you have to do to get the truck out on time."); Benin Decl. ¶ 7 ("I was required to perform manual labor, including but not limited to, moving inventory, loading trucks, cleaning, driving trucks, and filing forms related to delivery"); Lope Decl. ¶ 3 (same).)

These contentions are contrary to those Genesis's declarants. (See, e.g., Guidry Decl. ¶ 9 ("As a Transportation Supervisor, my job duties do not include physical labor tasks, such as moving inventory, loading or unloading vehicles, or cleaning the warehouse, as we have people for that. ... Accordingly, I never perform manual labor"); Billy Decl., ¶ 9 ("Driving or moving the trucks used for deliveries is not part of my job duties as a Transportation Supervisor. I have never driven a Genesis truck during my employment"); Parra Decl., ¶ 9 ("I may occasionally jump in to help load a vehicle while multi-tasking and overseeing the

11

process, pick up and discard pieces of trash or clean up a spill in the warehouse when it presents a potential safety hazard, or clean up my office space. I do so not because it is my responsibility or an expectation from management, but to set an example for my employees and show them that I am a team player while expediting operations at the facility. I always spend less than 50% of my week on the[se] types of tasks"). The divergence between Hamilton's experience and that of the other Transportation Supervisors was acknowledged by Hamilton himself who stated that the Transportation Supervisors from other sites "were shocked that we were actually doing this manual labor over here, the amount of work that we were doing. They were shocked." (Hamilton Depo. II, at 417:19-418:3.)

Hamilton contends that this court should find that common issues predominate because the Transportation Supervisors who provided declarations for Genesis described performing a similar set of job duties. (Reply at 5.) It is true that these employees described a largely identical list of tasks. These tasks included, among others, "conducting safety and quality observations of drivers and providing coaching and training in areas needing improvement"; "coaching and training drivers to achieve Genesis' goals related to quality of service, accurate and on-time deliveries, customer services expectations"; "managing drivers' workloads, including making adjustments to driver's routes and schedules as necessary to ensure that operations run efficiently and deliveries to Genesis' customers are timely"; "assigning responsibilities to drivers such as new-driver trainings, orientation, and ride-a-longs"; "coaching and disciplining drivers as needed, including performance evaluations and write-ups where

12

1  necessary"; "providing input with respect to more severe discipline
2  and terminations"; "responding to driver complaints and grievances,
3  including diffusing tensions among drivers when issues arise";
4  "conducting audits of driver to evaluate drivers' performance";
5  "monitoring legal compliance issues including Department of
6  Transportation regulations regarding, among other issues, hours of
7  service"; and "generally managing the day to day operations of the
8  Transportation Department." (See Opposition, Ex 1. Compendium of
9  Evidence ¶¶ 23-28.) Each of the seven Transportation Supervisors
10 assert that they spent at least 70% or more of their time at work
11 performing these and similar tasks. (See Guidry Decl., ¶¶ 6, 14
12 (stating that he spends on average 90% to 97% of time per week on
13 above and similar tasks); Parra Decl., ¶ 8 (average of 70% to 90%);
14 Billy Decl., ¶¶ 6-8 (average of 80%); Spaziani Decl., ¶ 6 (average
15 of 85% to 90%); Lund Decl., ¶¶ 5-6 (average of 85%); Lehndorfer
16 Decl., ¶¶ 9-10 (average of 75% to 85%); Del Rio Decl., ¶¶ 5-7
17 (average of 80% to 85%).)

18      However, the common description of duties does not satisfy
19 Hamilton's burden under Rule 23(b)(3). In seeking class
20 certification, Hamilton's burden is not merely to show that there
21 are common experiences among the putative class members; he must
22 offer common evidence that the class members were misclassified.
23 See Marlo, 251 F.R.D. at 484; Sav-On, 34 Cal.4th at 329-330. Here,
24 the common job duties cited by Genesis's declarants were offered to
25 prove that putative class members were properly classified as
26 exempt because they performed management duties during the majority
27 of their work time. The duties cited by these declarants would
28

13

ordinarily constitute exempt, management functions.[1] Accordingly, Hamilton cannot rely on the commonality among Genesis's declarants' descriptions of their job duties to establish predominance.

In response to this objection, Hamilton suggests that the duties described by Genesis's declarants involved less discretion than the declarants themselves stated. (Reply at 8.) However, in making this argument, Hamilton relies solely on his own experience at Genesis. (See Reply at 8-9 (citing Hamilton Depo. I at 40-46 (describing experience of being allotted limited discretion in ensuring proper staffing levels) and at 205-215 (describing limited discretion with respect to performance evaluations).) Hamilton's own experience is not strong evidence of common experiences throughout the class.

Hamilton also points to several additional items of evidence in support of his motion for class certification, but such evidence is unavailing. First, Hamilton notes Genesis's acknowledgment that it has classified all employees with the position "Transportation Supervisor" as exempt and paid all such employees with a salary rather than on an hourly basis. (Declaration of Roberg Kashfian in Support of Motion ¶ 14, Ex. E (Genesis Supplemental Response to Requests for Admissions, No. 6, 7).) However, such a policy is not

---

[1] Wage Order 9 provides that the activities constituting exempt and non-exempt work shall be construed in the same manner as such items are construed in specified federal regulations effective as of the date of Wage Order's promulgation. 8 C.C.R. § 11090(1)(A)(4) (referring to, *inter alia*, 29 C.F.R. § 541.102 (2000)). Former § 541.102 (2000) lists "management" duties as including: "interviewing, selecting, and training of employees"; "directing their work"; "appraising their productivity and efficiency for the purpose of recommending promotions or other changes in status"; "handling their complaints and grievances and disciplining them when necessary; "apportioning the work among the workers"; "providing for the safety of the men and the property."

14

common evidence of misclassification in the absence of evidence showing that the policy was wrongful. See Marlo, 251 F.R.D. at 484. ("[A] class-wide determination of misclassification generally cannot be proved from the existence of an exemption policy alone.")

Second, Hamilton points to documents reflecting a similar management structure at the various Genesis locations. (Kashfian Decl. ¶ 19.) However, such similarity is of little probative value given the lack of evidence of a policy of misclassification.

Third, Hamilton cites similar job postings for Transportation Supervisors at the Fontana, Fullerton, and San Diego facilities (Kashfian Decl. Ex. H) and a role profile for Transportation Supervisors at Union City. (Id. Ex. I.) However, such postings, again, are only evidence that Transportation Supervisors were expected to perform similar duties and were classified as exempt, not that they were misclassified. Hamilton contends that the role profile "asserts that 70% of the time Transportation Supervisors perform non-exempt work." (Mot. at 4.) However, he provides no explanation for this contention and the role profile itself describes a set of duties comprising 70% of the employee's time that would ordinarily be considered exempt, largely mirroring the tasks listed by Genesis's declarants. (See Kashfian Decl. Ex. H and I.) In any case, "the focus of the exemption test is the employee's actual work activities and these job descriptions simply do not establish what [Transportation Supervisors] actually do." Marlo, 251 F.R.D. at 486.

In sum, the court finds that Hamilton has not met his burden to show that common issues predominate.

**2.   Superiority**

Under Rule 23(b)(3), Hamilton must also show that a class action is superior to other methods of adjudicating the controversy. <u>Valentino v. Carter-Wallace, Inc.</u>, 97 F.3d 1227, 1235 (9th Cir. 1996). As the Advisory Committee explained in its Note to Amended Rule 23, "Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."

Hamilton contends that class treatment is superior to other methods of adjudication because it would "allow the class litigants a chance to redress their claims against a large, resourceful defendant." (Mot. at 24.) He argues that if each individual class member were required to file an individual lawsuit, Genesis could exploit and overwhelm the limited resources that each individual class member could bring to bear to prosecute his or her case. (<u>Id.</u>)

The court is not persuaded. This case involves a relatively small putative class of 30 individuals. At least seven putative class members, more than a fifth of the group, have already signaled, through their signing declarations in opposition to class certification, that they would likely opt out of the class, leaving a group of at most 23 class members. This group is not so large that individuals within the group who wish to pursue misclassification-based wage and hour actions against Genesis could not join their claims and enjoy the resulting economy of scale in financing and prosecuting their claims. Indeed, as Hamilton has

16

brought to the court's attention, three other Genesis Transportation Supervisors have already brought a joint misclassification suit against Genesis. (See Plaintiff's Request for Judicial Notice (Dkt. No. 33) (Derrick Welch et al. v. Genesis Logistics, Inc., Case No.RG13698984 (Jan. 10, 2014).) Such an approach would not run the risk of sacrificing procedural fairness as would result from applying class treatment to claims that may not be representative of all members of the class. Accordingly, the court finds that class treatment is not a superior method of adjudication in this case.

Because Hamilton has failed to satisfy the requirements of predominance and superiority under Rule 23(b)(3), the instant motion for class certification must be denied.

**IV. Conclusion**

For the reasons stated herein, Hamilton's Motion for Class Certification (Dkt. No. 32) is DENIED.

IT IS SO ORDERED.

Dated: August 22, 2014

DEAN D. PREGERSON
United States District Judge

17